**Justin ORWAT, Plaintiff,**

v.

**Michael T. MALONEY, etc., et al., Defendants.**

**No. CIV.A.2002–10409–WGY.**

United States District Court, D. Massachusetts.

March 3, 2005.

Gregory A Connly, Dolan, Connly & Flaherty, PC, Boston, for Justin Orwat, Plaintiff.

Richard C. McFarland, Department of Correction, Boston, for Department of Correction, Ernest J. Therien, Jeffrey Padula, Michael T. Maloney, Peter Allen, Peter A. Pepe, William Grossi, William Shugrue, Defendants.

C. Raye Poole, Department of Correction Legal Division, Boston, for Department of Correction, Ernest J. Therien, Jeffrey Padula, Michael T. Maloney, Peter Allen, Peter A. Pepe, William Grossi, William Shugrue, Defendants.

Jeffrey M Sankey, Law Office of Jeffrey M. Sankey, Mansfield, for Justin Orwat, Plaintiff.

## ORDER ADOPTING REPORT AND RECOMMENDATION

YOUNG, Chief Judge.

After careful review of the objections thereto, this Report and Recommendation is adopted in its entirety. The motion for summary judgment is allowed in part and denied in part accordingly.

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (# 53)

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court on the Defendants' Motion for Summary Judgment (# 53). The Plaintiff, Justin Orwat ("Orwat"), was, at all relevant times, an inmate at MCI–Cedar Junction ("Cedar Junction"), a state correctional facility in

Walpole, Massachusetts. Orwat brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of the First, Eighth and Fourteenth Amendments, and various state laws, against officials of the Department of Correction for the Commonwealth of Massachusetts, various correctional officers at Cedar Junction,[1] and the Department of Correction itself. The complaint stems from an incident in which a correctional officer, defendant Jeffrey Padula, struck Orwat in the face during a strip search of Orwat and an inspection of Orwat's cell. Orwat was treated for a fractured jaw following the incident. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment, # 54, Statement of Undisputed Facts, at 4 ¶ 9).

Previously, the Defendants in this action filed a motion to dismiss (# 11) and, following a hearing (January 6, 2003) on the matter, this Court recommended that Counts 4 (Violation of 18 U.S.C. § 1964(c)) and 10 (Negligence–Massachusetts Tort Claim Act) be dismissed as unopposed by the Plaintiff. (Report and Recommendation on Defendants' Motion to Dismiss, # 26). This Court, in its Amended Report and Recommendation (# 31) otherwise recommended that Defendants' Motion to Dismiss all other claims be denied without prejudice to Defendants filing a motion for summary judgment. The District Court adopted these recommendations, and further dismissed any claims for damages against the Defendants in their official capacities absent a waiver of the Commonwealth's sovereign immunity. (Order, # 36). *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985) (Eleventh Amendment bars suit for money damages against state officials in their official capacity); *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (state officials are not "persons" within the meaning of section 1983).

At this juncture, then, the Defendants have moved for summary judgment on all the remaining federal claims. The Defendants further move to dismiss for failure to state a claim two of the pendent state law claims (Counts 7 and 9) and alternatively urge the Court to dismiss all the state law claims in the absence of a viable federal cause of action and pendent jurisdiction.

The Plaintiff has submitted an Opposition to the Defendants' Motion for Summary Judgment. (# 55). In that Opposition, the Plaintiff, based upon facts learned during discovery, agrees to dismiss Count 3 against Maloney and Pepe. The Plaintiff also agrees to dismiss Counts 5, 6, 7 and 9 against defendant Therien only. At this juncture, then, the remaining claims are: Counts 1 and 2, asserting Eighth Amendment claims against Padula and Shugrue; Count 5, asserting a conspiracy to violate civil rights against Padula, Shugrue and Grossi; Count 6, asserting procedural due process violations against Maloney, Pepe and Allen; Count 7, asserting a violation of the Massachusetts Civil Rights Act, against all remaining defendants; Count 8, asserting assault and battery against Pa-

---

1. The complaint sued the various officials in their official and individual capacities. Pursuant to the District Court's Order (# 36) dated June 27, 2003, the suit continues as one against the officials in their individual capacities only. Named as defendants are: Michael T. Maloney, at all relevant times the Commissioner of the Department of Correction for the Commonwealth of Massachusetts; Peter Pepe, Jr., formerly the Superintendent of Cedar Junction; Peter Allen, former Superintendent of Cedar Junction; William Grossi, Lieutenant in Cedar Junction's Inner Perimeter Security Unit ("IPS"); Ernest J. Therien, disciplinary officer at Cedar Junction; William Shugrue and Jeffrey Padula, members of an IPS unit at Cedar Junction.

dula; and Count 9, asserting intentional infliction of emotional distress against Padula, Shugrue and Grossi. The Defendants have submitted a Memorandum in Reply to Plaintiff's Opposition for Summary Judgment. (# 56). The motion is therefore ripe for disposition on the remaining claims. For the following reasons, as more fully explained below, the Court recommends granting the Defendants' motion in part, and denying the motion in part.

## II. FACTUAL BACKGROUND

The following facts are not in dispute. Orwat was at all relevant times an inmate at Cedar Junction. The defendants William Shugrue ("Shugrue") and Jeffrey Padula ("Padula") were members of the Inner Perimeter Security unit ("IPS") that investigated crimes within the prison. (# 54 at 2 ¶ 2). Defendant William Grossi ("Grossi") was the Supervisor of the IPS unit at the time of the incident. *Id.* On January 26, 2001, Shugrue and Padula entered Essex 1 housing unit in order to search inmate Robert Veins ("Veins"), who was housed in cell # 34. *Id.* ¶ 3. During this search, Orwat, who was housed in cell # 32, held a mirror out of his cell to see what was going on. *Id.* ¶ 5. Padula told Orwat to take the mirror back into the cell. *Id.* Initially, Orwat refused, but ultimately complied. *Id.* At some point (disputed by the parties), Padula and Shugrue decided to search Orwat's cell. According to Orwat, Padula and Shugrue decided to enter Orwat's cell with the intention to confront and assault Orwat in retaliation for exchanging insulting words. (Complaint, # 1 ¶ 14). Padula and Shugrue both maintain that, on passing by Orwat's cell on their way to search Vein's cell, they observed Orwat jump up to flush the toilet; they believed he was disposing of contraband. (# 54 at 2 ¶ 4). In any event, Shugrue and Padula entered Orwat's cell. Padula, in an attempt to position himself at the back of the cell, squeezed by Orwat, who asked "why are you walking so close to me?" (# 54 at 3 ¶ 7). Padula and Shugrue asked Orwat to strip.

The parties dispute the details of the ensuing incident. According to Padula, Orwat "thrust his right hand with his middle finger extended, directly toward Padula's face." (# 54 at 3 ¶ 7). Padula perceived the gesture as "threatening his safety" and he struck Orwat in the face. *Id.* Orwat disputes this account, and testified that during the search, he raised his hand "slowly in a real sarcastic manner" with his middle finger extended, and he "hung it there in front of [Padula's] face for an instant or two and ... looked at him, real slow and deliberate." (# 55 at 3 ¶ 7). Orwat further testified that Padula hit him three to five times, including the punch to the jaw. (# 54, Exh. E at 80). Following this incident, Orwat was taken to Boston Medical Center where he was surgically treated for his injuries, which included a fractured jaw. (# 54 at 4 ¶ 9; Exh. E at 100). Orwat spent two days at Boston Medical Center and approximately three and one half weeks at the Health Services Unit of the Souza–Baranowski Correctional Center (SBCC). (# 54, Exh. F).

Padula filed a disciplinary report, (# 55 Exh.G), charging Orwat with several disciplinary offenses, including using obscene, abusive, threatening language or gestures and attempting to assault Padula. Following his release from the infirmary, Orwat was place on "awaiting action" status pending the hearing on the matter. In August, 2001, the hearing officer, Captain Donna Rizzi ("Rizzi"), issued a written opinion finding Orwat guilty of the disciplinary charges. She recommended that the eight months Orwat had served in

segregation was a sufficient sanction. (# 55 Exh. I at 4C).

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the record shows that "the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1 Cir., 2000) (internal quotations and citation omitted.). "[A]n issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party." *Fajardo Shopping Center, S.E. v. Sun Alliance Ins. Co. of Puerto Rico, Inc.*, 167 F.3d 1, 7 (1 Cir., 1999); *see also Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1 Cir.), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

The party moving for summary judgment "bears the initial burden, which may be discharged by pointing to the absence of adequate evidence supporting the nonmoving party's case." *Michelson v. Digital Financial Services*, 167 F.3d 715, 720 (1 Cir., 1999) (citations omitted). Once the moving party has met its burden, "the onus is on the nonmoving party to present facts that show a genuine issue for trial." *Id.* (citations omitted). In determining whether summary judgement is proper, the Court "view[s] all facts in the light most favorable to the nonmoving party and indulge[s] all inferences advantageous to that party, provided they arise reasonably from the record." *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1 Cir.) (citation omitted), *cert. denied*, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). The party opposing summary judgment, however, "may not rest on mere allegations or denials of his pleading . . . ." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1 Cir., 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied*, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). Rather, to resist summary judgment, the nonmoving party must produce "definite, competent evidence" on which the nonmovant bears the ultimate burden of proof. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1 Cir., 1991) (citations omitted), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1996) (stating that summary judgment must enter "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

### B. Federal Constitutional Claims

Counts 1, 2, 5 and 6 assert deprivation of constitutional rights in violation of 42 U.S.C. § 1983. To prevail on a section 1983 claim, a plaintiff must prove a violation of a constitutional right by a person or persons acting under color of state law. *Soto v. Flores*, 103 F.3d 1056, 1061–1062 (1 Cir., 1997), *cert. denied*, 522 U.S. 819, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997). As the Defendants do not dispute that they were acting under color of law, the focus here is whether the Defendants' "conduct [has] worked a denial of rights secured by the Constitution or by federal law." *Id.* (citation omitted.)

### 1. Eighth Amendment Violations– Defendants Padula and Shugrue

In Counts 1 and 2, Orwat alleges that Padula and Shugrue deprived him of

rights under the Eighth Amendment. It is settled law that both the treatment of prisoners as well as the conditions of their confinement are subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citation omitted); *Evicci v. Baker,* 190 F.Supp.2d 233, 238 (D.Mass.2002) (citations omitted.) "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (citing *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Here, Orwat has alleged excessive and unnecessary force. The proper standard for evaluating such allegations is set out in *Hudson v. McMillian:* "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . .: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 6–7, 112 S.Ct. at 999. Not "every malevolent touch by a prison guard gives rise to a federal cause of action," *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2 Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)), and conduct involving "*de minimus* force" does not constitute a

violation of the Eighth Amendment. *Id.* at 9–10, 112 S.Ct. at 1000.

### a. *Officer Padula*

■ Count 1 of the complaint alleges that Padula struck Orwat, not to restore or maintain discipline, but maliciously and sadistically to cause harm to the Plaintiff. (# 1 ¶ 21). Orwat alleges that, following an exchange of insulting words between Orwat and Padula, Padula and Shugrue decided to enter Orwat's cell, intending to confront and assault him for exchanging insulting words. (# 1 ¶ 14). The complaint further alleges that Padula and Orwat continued to exchange words, and that Orwat extended his middle finger toward Padula and that Padula struck Orwat in the face in reprisal for the gesture, and not because Orwat posed a threat to Padula. (*Id.* ¶¶ 16–17.) Orwat also maintains that Padula continued to strike Orwat as he, Orwat, grabbed the cell bars. (# 1 ¶ 17).

The Defendants do not contend that the force applied here was *de minimus:* Orwat undisputedly suffered a fractured jaw that required surgery, and case law establishes that a fractured jaw amounts to more than *de minimus injury.*[2] *See e.g., Hudson,* 503 U.S. at 10, 112 S.Ct. at 1000 (bruising, swelling, loosened teeth and cracked dental plate not *de minimus* for Eighth Amendment purpose). The issue then is whether Orwat has produced suffi-

---

**2.** The Defendants argue that Padula's actions were a "spontaneous response" and as such do not amount to a constitutional deprivation as a matter of law. For this argument, the Defendants rely on *Johnson v. Glick,* 481 F.2d 1028, 1032 (2 Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), and a statement in *Johnson* that "although a spontaneous attack by a guard is 'cruel' and, we hope, 'unusual,' it does not fit any ordinary concept of 'punishment.'" The Court questions whether the Second Circuit's statement in *Johnson* is still good law. The Sec-

ond Circuit has characterized this statement as *dicta* and has refused to apply it. *See United States v. Walsh,* 194 F.3d 37, 48–49 (2 Cir., 1999) (noting that *Hudson* expanded the concept of punishment). *Cf. Pelfrey v. Chambers,* 43 F.3d 1034, 1036–1037 (6 Cir.) (rejecting lower court's conclusions that an isolated assault by a prison guard on an inmate is not punishment within the Eighth Amendment.) (internal quotations omitted), *cert. denied,* 515 U.S. 1116, 115 S.Ct. 2269, 132 L.Ed.2d 273 (1995).

cient evidence that Padula acted maliciously or sadistically to harm Orwat, and not to restore discipline.

The Court begins by noting that inferences may be drawn from, among other things, "the extent of injury suffered by an inmate," *id.* at 7, 112 S.Ct. at 999 (citing *Whitley v. Albers*, 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)) (other citation omitted), in determining whether the use of force evidenced wanton conduct. Here, the Defendants do not dispute that Orwat suffered a broken jaw that required surgery, and that required him to spend three and a half weeks in the infirmary. This evidence may permit the inference that the attack involved more force than was necessary to subdue Orwat. *See, e.g., Evicci*, 190 F.Supp.2d at 239. *See also Hudson*, 503 U.S. at 7, 112 S.Ct. at 999 (proper to consider need for application of force and relationship between that need and force used.) Shugrue testified that guards are "verbally abused" just about every day, (# 54, Exh. A at 62), and that although Orwat used abusive language during the search, that Orwat didn't "threaten" Padula (# 54, Exh. A at 67) and that he (Shugrue) did not consider placing Orwat in restraints in the cell, even when Orwat acted belligerantly. (*Id.* at 68). Furthermore, Orwat testified that, during the search, after Padula had asked Orwat to give him his boxer shorts, Orwat "raised [his] hand slowly in a real sarcastic manner, with [his] middle finger extended, and ... hung it there in front of [Padula's] face for an instant or two, and ... looked at him, real slow and deliberate." (# 55, Exh. A at 63). Orwat described the gesture as "slow and sarcastic" and testified that "[i]t definitely wasn't a jumping surge." (*Id.* at 72). Orwat further testified that it was when he turned to hand his boxer shorts to Shugrue that Padula hit him in the face. (*Id.* at 63). He also testified that Padula hit him repeatedly. (*Id.*).

The officers describe a different scene. Padula testified that, during the search of Orwat, Orwat came towards him with his right hand up approximately an inch from his face, (# 54, Exh. C at 86), and that he "thought [he] was going to be assaulted." *Id.* at 90. It was at that point that Padula testified that he struck Orwat. Shugrue testified that he saw Orwat "throw his right hand into Padula's face" and that Orwat "[went] after [Padula] again swinging both his fists." (# 54, Exh. A at 71). The Defendants argue that the facts establish that Padula's use of force was permissible because Padula was acting to defend himself against what he perceived to be threatening actions taken by Orwat, and that DOC Use of Force Regulations permit such a use of force. (Defendants' Memorandum in Reply to Plaintiff's Opposition to Motion for Summary Judgment, # 56 at 3–4).

DOC regulations may indeed permit correctional officers to use force in self-defense, but the Defendants' argument begs the question: Was force excessive or warranted in this case? The medical evidence establishes that Orwat suffered a broken jaw following the incident. Viewing the evidence in the light most favorable to Orwat, the Court must assume that Padula hit Orwat in the face, even though Orwat's gesture and words, though concededly belligerant, were not threatening. Furthermore, Orwat's testimony could support an inference that Padula hit Orwat with the intent to cause Orwat harm in retaliation for Orwat's belligerence. Thus, although Padula and Shugrue have testified, in essence, that Orwat thrust his finger into Padula's face, causing Padula to fear for his safety, the Court concludes that Orwat has produced sufficient evidence to create a triable issue.

■ The Defendants further argue that Padula is protected from suit under

the doctrine of qualified immunity. Qualified immunity applies when a government official's "behavior does not violate clearly established statutory or constitutional rights of 'which a reasonable person would have known.'" *Brennan v. Hendrigan*, 888 F.2d 189, 192 (1 Cir., 1989) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "The test is an objective one: the immunity inquiry focuses not on the official's subjective belief about his conduct, but on whether the belief he held was objectively unreasonable." *Brennan*, 888 F.2d at 192 (internal quotations and citations omitted).

The Eighth Amendment's proscription against use of excessive force was well established at the time of the incident. Moreover, there is no basis on which the Court can determine the "objective legal reasonableness" of Padula's actions. *Wood v. Clemons*, 89 F.3d 922, 927 (1 Cir., 1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). Here, Orwat has produced sufficient evidence from which an inference may be made that Padula knowingly violated Orwat's Eighth Amendment rights.

### b. Count 2—Officer Shugrue

Count 2 of the complaint alleges that Shugrue "knew of and participated in Defendant Padula's plan to enter the Plaintiff's cell to confront and assault the Plaintiff in retaliation for insulting Defendant Padula," (# 1 ¶ 26), and that Shugrue "failed to intervene and protect [Orwat] in a timely manner ...." (# 1 ¶ 28). The Defendants move for summary judgment on this count by noting that "it is undisput-ed that Shugue [sic] did not use any force against Orwat ...," # 54 at 7, and by pointing to Orwat's own deposition testimony in which Orwat testified that Shugrue did in fact intervene on Orwat's behalf.

■ While Shugrue's failure to intervene to prevent Padula's assault could amount to a constitutional deprivation, *see, e.g., Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n. 3 (1 Cir., 1990) (stating that police officers at scene have duty to intervene if they witness another officer use excessive force) [3], *cert. denied*, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991), Orwat's own deposition testimony does not support the allegations that Shugrue "failed to intervene in a timely manner" on Orwat's behalf. On the contrary, Orwat stated in his deposition that, as for the initial punch, Orwat was hit "bang, out of nowhere." (# 55, Exh. A at 63). After the initial blow, Orwat testified that Shugrue fumbled with the microphone in an effort to call for help and then "tried to intervene." (# 54, Exh. E at 80). Orwat further stated that "I think he was trying to help me." (*Id.* at 81). Liability attaches in such a case only if the officer had a "reasonable opportunity" to prevent the attack. *Gaudreault*, 923 F.2d at 207 n. 3. Orwat points to the following deposition testimony to support that contention:

> At the same time, I'm screaming to Shugrue, get this guy off me, get him off me Shugrue, get him off me. And instead of getting him off of me, Shugrue gets on the microphone, his little shoulder piece, and he's in such a panic, ... he's screaming to—for assistance, but he's in such a panic, he fumbles with the radio

**3.** In *Davis v. Rennie*, 264 F.3d 86 (1 Cir., 2001), *cert. denied*, 535 U.S. 1053, 122 S.Ct. 1909, 152 L.Ed.2d 820 (2002), the First Circuit noted, without opinion, that "at least one court has found that a prison guard has a duty to protect a prisoner from the use of excessive force by another prison guard." *Id.* at 98 n. 9 (citing *McHenry v. Chadwick*, 896 F.2d 184, 186 (6 Cir., 1990)).

and it falls all over the place. And it's dangling on the cord. He finally gets it back up, he yells for assistance three times. Finally ... I see Shugrue trying to pull Padula off me.

(# 55, Exh. A at 64.)

Nothing here suggests that Shugrue had a realistic opportunity to prevent the initial blow. At best, it suggests that Shugrue's attempt to intervene was negligent. *Cf. Brennan*, 888 F.2d at 194, n. 3. ("[n]egligence alone will not support a section 1983 claim.") (citation omitted). For these reasons, the Court concludes that summary judgment should enter in favor of Shugrue on the allegation that Shugrue failed to intervene in a timely manner.

 Orwat also alleges that Shugrue "knew of and participated in Padula's plan" to assault Orwat in his cell.[4] This allegation amounts to an allegation that Shugrue conspired to deprive Orwat of his Eighth Amendment rights. In order to establish a conspiracy under section 1983 the plaintiff must prove that there been an agreement and an actual deprivation of a right secured by the Constitution and laws. *See Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1 Cir., 1980). As noted, Orwat has sufficiently established, for summary judgment purposes, an Eighth Amendment violation. Assuming Padula used excessive force, the question here is whether he has also established that defendant Shugrue conspired with Padula to attack him in his cell, and to deprive him of his Eighth Amendment right to be free from cruel and unusual punishments. To stave off summary judgment, the Plaintiff

argues that inmate Veins' deposition testimony is sufficient to create a dispute of fact. In his deposition, Veins testified that both officers stated "Let's go see him. Let's go see what he's got to say now."[5] (# 55, Exh. E at 18).

The Court disagrees that this evidence is sufficient to create an issue of fact. The alleged constitutional deprivation is Padula's excessive use of force; Orwat does not challenge the constitutionality of the strip search itself. Although Veins' testimony may support an inference that the strip search itself may have been improperly motivated, the Court concludes that a jury could not reasonably infer from these statements, particularly in light of their mischaracterizations, and particularly in light of Orwat's own testimony about Shugrue's efforts to intervene on his behalf, that Shugrue "knew of and participated in Defendant Padula's plan to enter the Plaintiff's cell to confront and assault the Plaintiff ...." For that reason, the Court recommends that summary judgment enter in Shugrue's favor on Counts 2 and 5, on the allegation that Shugrue conspired to deprive Orwat of his Eighth Amendment rights.

## 2. Conspiracy to Violate Civil Rights

Count 5 of the complaint alleges that defendants Padula, Shugrue and Grossi conspired to violate Orwat's civil rights by bringing false disciplinary charges against Orwat, by fabricating reports and testimony to support those charges, and by altering a videotape to cover up Padula's actions and to deprive Orwat of purportedly exculpatory evidence. Orwat alleges that

---

4. Orwat alleges in Count 5 that Shugrue conspired to deprive him of his civil rights. The Court treats the allegations in Counts 2 and 5 as duplicative of the conspiracy claim.

5. In his brief, Orwat quotes Veins' testimony as follows: "Let's go see this punk. Let's get

him. Let's go see what he's got to say now." In fact, the Plaintiff has amalgamated a number of Veins' statements. Veins never in fact (despite prompting from counsel at deposition) said "Let's get him."

these actions deprived him of rights secured by the First and Fourteenth Amendments.

"In order to make out an actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement [6] but also an actual abridgment of some federally-secured right." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1 Cir., 2001) (citations omitted). "Moreover, it is the plaintiff's burden to identify the specific constitutional right infringed …." *Id.* (citation omitted). The Defendants argue that Orwat has failed to establish "an actual deprivation of a right by the Constitution." It is on this issue that Orwat's claims founder.

### a. First Amendment and Fourteenth Amendment Violations

Orwat argues that defendants Padula, Shugrue and Grossi have conspired to deny him the "meaningful ability to defend himself," (# 1 ¶ 48), in violation of the First and Fourteenth Amendments, by agreeing to file false reports and by agreeing to alter the videotape that purportedly contained exculpatory evidence.[7] He argues that this alleged "cover-up"—the allegedly false disciplinary report and false

testimony and the altered videotape—resulted in the hearing officer's adverse judgment against him and in his confinement in segregation. The Court determines, however, that Orwat has failed to establish that any of the challenged actions violated a federally secured right.

### i. Officers Padula and Shugrue

Orwat contends that Padula filed a false disciplinary report and that Shugrue conspired to support that report. Even assuming that Orwat's version of events is true, this claim fails because prison inmates have "no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout*, 808 F.2d 949, 951 (2 Cir., 1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988). *Accord Hanrahan v. Lane*, 747 F.2d 1137, 1139–40 (7 Cir., 1984). The constitutional corrective for such things is the subsequent hearing that the inmate receives on those charges.[8] As long as the hearing itself provides the minimum due process protections as set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41

---

**6.** Orwat offers no direct evidence of a conspiratorial agreement, arguing instead that circumstantial evidence suffices here to establish the existence of an agreement. For example, Orwat argues that his expert has cast "serious doubt" (# 55 at 11) on Lieutenant Grossi's explanation about how a gap appeared in a videotape containing purportedly exculpatory evidence. This evidence, he argues, along with the delay in the investigation and the relationship between the officers, all might support an inference of conspiracy. Because the Court determines that summary judgment is appropriate on other grounds, it need not resolve this issue.

**7.** Orwat alleges that the Defendants denied him the ability to defend himself in a meaningful way at his disciplinary hearing. This assertion is more properly characterized as a

procedural due process claim, and the Court takes up that analysis below. Orwat has pointed to no facts that suggest that his access to this Court and his First Amendment right to seek redress on his civil rights claims has been impeded, nor has he made such an allegation. He appears, however, to argue this point in his brief. To the extent that Orwat's complaint can be read to include such an allegation, the Court takes up that issue below.

**8.** Orwat has not alleged that Padula filed the allegedly false disciplinary report in retaliation for Orwat's exercising constitutionally protected conduct, nor do the facts support such an inference. Such an allegation would require a different inquiry. *See, e.g., Shabazz v. Cole*, 69 F.Supp.2d 177, 197 (D.Mass., 1999).

L.Ed.2d 935 (1974), and the prisoner has the opportunity to present and rebut witnesses, then the prisoner has effectively been accorded his constitutional due. *See, e.g., Hanrahan,* 747 F.2d at 1139–40. Orwat challenges the hearing itself on procedural due process grounds in Count 6, and the Court concludes below that the disciplinary hearing complied with the minimum constitutional protections in *Wolff.* In short, Orwat's conspiracy claim against Padula and Shugrue cannot survive summary judgment, because nothing in the record establishes that Orwat was unable to present his version of events, or that his right to defend himself against the disciplinary charges was rendered hollow: The hearing officer simply did not believe his version of events.

### ii. Lieutenant Grossi

 Grossi was the IPS commander at the time of the incident at issue. Following the incident, Orwat and his attorney learned that a video camera was installed on Essex I, the unit in which Orwat was housed. Before the disciplinary hearing, and at the request of both the hearing officer and Orwat's attorney, Sergeant Therien, the disciplinary officer, requested Grossi to make a copy of the videotape for use at the disciplinary hearing. Grossi personally made a copy of the tape. (# 54, Exh. B at 81). During a viewing of the tape, on June 18, 2001, Orwat's counsel and Therien discovered there was a gap in the tape of about one and a half minutes, which coincided with the time of the incident. Therien informed Grossi that there was a problem with the first copy of the tape, and instructed Grossi to make another copy. Grossi did so. (*Id.* at 84.) In the meantime, the hearing officer continued the hearing so that Orwat and his counsel could view the second tape. It is undisputed that Orwat viewed the second copy on July 5 and July 6, 2001, without his counsel, (# 55, Exh. I, Disciplinary Hearing Summary at 1A; # 54, Exh. 1 at 65), and that Orwat's attorney viewed the tape sometime later. (# 54, Exh. I at 66).

Orwat's only allegation against Grossi is that he conspired to alter the videotape in order to cover up Padula's excessive use of force, and that as a result he, Orwat, was denied the opportunity to present exculpatory evidence in his defense. Orwat submits expert testimony that disputes Grossi's explanation of how the gap in the tape was created. Grossi has testified that the tape he had originally made "popped out" of the recorder, causing the gap.

Even assuming that Orwat's expert testimony could permit the inference that Grossi deliberately altered the videotape, Orwat's claim against Grossi fails under the facts and as a matter of law because Orwat has not established that he was in any way harmed by the alleged tampering. Orwat admitted that both he and his attorney had the opportunity to view the videotape without the gap both before the disciplinary hearing and during the disciplinary hearing, and at no time did they indicate a gap in the second tape. (# 54, Exh. G at 2–3). Thus, under the principles set forth above, the record establishes that Orwat had the opportunity at the disciplinary hearing to challenge the reliability of the tape, but did not. *Cf. Hanrahan,* 747 F.2d at 1141 (finding "that an allegation that a prison guard planted false evidence which implicates an inmate in a disciplinary infraction fails to state a claim for which relief can be granted where the procedural due process protections as required in *Wolff v. McDonnell* are provided.") Indeed, on this record, Orwat and his attorney had full access to

the purportedly exculpatory evidence.[9] Grossi's alleged tampering with the video-tape, standing alone, could not have harmed Orwat, and worked no unconstitutional deprivation. In other words, even if Grossi attempted to conceal information from Orwat, that effort failed.

In addition, it is undisputed that the videotape reveals nothing about the incident itself. Orwat himself concedes that, on viewing the videotape, the angle of the videotape prevented him from seeing into his cell. (# 54, Exh. E at 97). Thus, it is far from clear how this evidence could have bolstered Orwat's defense. *Cf. Smith v. Mass. Dep't of Correction*, 936 F.2d 1390, 1401 n. 18 (1 Cir., 1991) (noting that a denial of discovery did not "[r]ise to the level of constitutional magnitude" where the requested items did not appear central to the inmate's defense, and where defendant's brief is "bereft of any developed argumentation to the contrary.")

For all the above reasons, the Court recommends that summary judgment enter in favor of Grossi on Count 5.

### b. First Amendment Claim: Access to Courts

■■■ To the extent that Orwat alleges that he was deprived of meaningful access to this Court as a result of a cover-up of an Eighth Amendment violation, his claim fails. Although it is true that under the First Amendment "individuals have a right of access to the courts which must be adequate, effective and meaningful," *Gonsalves v. City of New Bedford*, 939 F.Supp. 921, 926 (D.Mass.1996) (citing *Bounds v. Smith*, 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977)), Orwat has pointed to no evidence that establishes that the defendants have impeded—or will

succeed in impeding—his right of access to this Court. To establish a cognizable "cover-up" claim, Orwat must establish not only the cover-up, but also that the cover-up succeeded. *See Gonsalves*, 939 F.Supp. at 926 (stating that cover-up is only actionable if a defendant *succeeds* in preventing a claimant from discovering or proving a violation of his constitutional rights.) But this is not a case in which Orwat "lack[s] the knowledge of the facts necessary to seek redress for [his] asserted injuries." *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7 Cir., 2000). Rather, Orwat was a "face-to-face participant[ ]," *id.*, in the circumstances surrounding his Eighth Amendment claim. For this reason, a jury cannot find for Orwat on the claim that Padula and Shugrue somehow covered up the circumstances surrounding the incident. Ultimately, the purported "cover-up" will be adjudged as a question of credibility of the witnesses. *Cf. Cefalu*, 211 F.3d at 424 (stating that "to the extent the evidence suggests that the defendants resolved not to conduct a meaningful investigation ... a jury could not find for the plaintiffs on the cover-up claim because the facts that [the plaintiffs] needed to recover for their asserted injuries have always been known to them.") (citations omitted). *See also Vasquez v. Hernandez*, 60 F.3d 325, 329 (7 Cir., 1995) (stating that the "cornerstone" to a First Amendment right-of-access claim is "that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access" and that the claim is not actionable where "the cover-up failed to achieve such ends."), *cert. denied*, 517 U.S. 1156, 116 S.Ct. 1545, 134 L.Ed.2d 648 (1996). By

---

9. The Defendants argue that Orwat was un-harmed because the hearing officer did not rely on the tape. The assertion here, however, is that the tape contained exculpatory evidence and that therefore the hearing officer should have relied on it. Nevertheless, for the reasons stated, the ·Court sees no due process violation here.

contrast, *Gonsalves,* upon which Orwat relies, involved a "cover-up" by police officers who allegedly beat to death an arrestee. The arrestee's estate brought suit and, critically, there were in *Gonsalves* no other witnesses to the incident other than the police officers. For that reason, the Court affirmed that an effort by "government officials to shield a dead victim's family from key facts which would form the basis of his survivor's claims for redress violates the constitutional rights of those survivors." *Gonsalves,* 939 F.Supp. at 926. There is no evidence that the defendants have succeeded in denying Orwat access to "key facts" or that they will succeed, given Orwat's participation in the alleged Eighth Amendment violation, and Orwat's access to the complete videotape.

For all the above reasons, the Court recommends that summary judgment be granted in favor of the defendants on Count 5, alleging a conspiracy to violate Orwat's First and Fourteenth Amendment rights.

### 3. Procedural Due Process Violations

■ Count 6 of the complaint alleges procedural due process violations against defendants Maloney, Pepe and Allen. Settled law entitles prisoners to "claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), *quoted in Childers v. Maloney,* 247 F.Supp.2d 32, 36 (D.Mass., 2003). In order to establish a due process violation, however, Orwat has the "difficult burden," *Childers,* 247 F.Supp.2d at 36, of establishing both "that the disciplinary proceeding against him did not meet the applicable due process standards," and "that he was deprived of a protected due process interest as a result." *Id.* The Court determines that Orwat's claim fails on both bases.

In Count 6, Orwat effectively alleges the disciplinary hearing failed to meet due process standards because, *inter alia,* the hearing officer was biased; the hearing officer did not require witnesses to be sworn in and limited Orwat's cross-examination of certain witnesses; and the hearing officer's findings are unsupported by the evidence. Orwat further maintains that he was deprived of a protected liberty interest when the defendants confined him in a segregation unit on January 26, 2001, while the investigation was purportedly being completed; provided no notice to Orwat about the hearing until April 23, 2001; delayed a hearing on the matter until July 10, 2001; and confined him in the segregation unit until the hearing officer released her decision on September 3, 2001. (# 1 ¶¶ 51–52). He further alleges that he was denied procedural safeguards mandated by 103 Mass. Regs. § 430.19 (1978) because he was confined in the segregation unit for an unreasonable amount of time before the hearing. The Court considers each of these arguments.

#### a. Was there a protected liberty interest?

■ Orwat argues that the defendants deprived him of a liberty interest when he was placed in a segregation unit for eight months following the incident. However, "[t]he Due Process Clause will not in most circumstances confer on an inmate a liberty interest in freedom from disciplinary procedures and heightened conditions of confinement." *Balsavich v. Mahoney,* 2004 WL 1497687, *3 (D.Mass.2004) (citing *Sandin v. Conner,* 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Under *Sandin,* "States may under certain circumstances create liberty interests which are protected by the Due Process Clause .... But these interests will be generally limited to freedom from restraint which ... imposes atypical and sig-

nificant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–484, 115 S.Ct. 2293 (citations omitted). Since *Sandin,* however, " 'the right to litigate disciplinary confinements has become vanishingly small.' " *Balsavich,* 2004 WL 1497687 at *3 (quoting *Wagner v. Hanks,* 128 F.3d 1173, 1175 (7 Cir., 1997)). Thus, "[t]o the extent that such suits remain viable, it appears so only where the confinement is so extreme as to alter the fundamental terms of an inmate's sentence, or where the procedures employed are so blazingly arbitrary and unfair as to amount to cruel and unusual punishment." *Id.* (citing *Miller v. Selsky,* 111 F.3d 7, 9 (2 Cir., 1997)).

Orwat argues, relying on *Puckett v. Commissioner of Correction,* 28 Mass. App.Ct. 448, 551 N.E.2d 1228 (1990), that DOC regulations, 103 Mass. Regs. § 430.19 (1978), created a protected liberty interest, and the Defendants violated that interest by confining him in segregation for eight months. The short response to this argument is that the regulation under consideration in *Puckett* has long since been revised to permit the prison officials "complete discretion to place inmates on 'awaiting action' status during the pendency of a disciplinary proceeding." *Santiago v. Cruz,* 2004 WL 1318889, *1 (D.Mass., 2004) (citing 103 C.M.R. 430.21(1)) [10]. Orwat's placement on "awaiting action" status here was authorized by the revised regulation because he had been charged with a disciplinary offense. Furthermore, *Puckett* was decided prior to *Sandin v. Conner,* which has significantly diminished the circumstances under which an inmate may argue that a given state regulation has created a liberty interest cognizable under the federal Due Process Clause. *See Balsavich,* 2004 WL 1497687, *3 (discussing pre- and post-*Sandin* landscape). Thus, although *Puckett* found that five and a half months in segregation was unreasonable based on a reading of the then-existing regulations, *Puckett* never determined the federal constitutional question posed in *Sandin:* whether such a confinement "impose[d] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin* "plainly intended to eliminate the basis for federal due process claims stemming from internal transfers and status changes that do not result in 'atypical hardship,' *i.e.,* hardship beyond the norms of ordinary prison life." *Dominique v. Weld,* 73 F.3d 1156, 1160 (1 Cir., 1996). Orwat has made no attempt to establish that the challenged sanction meets *Sandin* 's "threshold test of working a 'significant and atypical hardship in relation to the ordinary incidents of prison life'." *Id.* at 1161. *Cf. Balsavich,* 2004 WL 1497687, *4 n. 6 (six months in segregation does not create liberty interest). *See generally Dominique,* 73 F.3d at 1160 (transfer of prisoner from work release program to more secure prison did not constitute an atypical, significant deprivation giving rise to a federally protected liberty interest.)

■ Orwat also maintains that the Defendants delayed serving the Disciplinary Report until April 23, 2001, and that the delay in scheduling Orwat's hearing until

**10.** 103 Code Mass. Regs. § 430.21(1) states in relevant part:

At the discretion of the Superintendent or his designee, and subject to any applicable review requirements, an inmate who is under investigation for a possible disciplinary offense or has been charged with or found guilty of a disciplinary offense, may be placed on awaiting action status at the institution where he is then confined. Such status may include more restrictive confinement as deemed appropriate by the Superintendent or his designee.

July 10, 2001, violated the Due Process clause. (# 1 ¶ 52). This argument fails under both the facts and the law. Orwat has not pointed to "any state-created liberty interest, by way of law or regulation, in the speedy trial of a prison disciplinary charge." *Balsavich*, 2004 WL 1497687, at *4. Furthermore, the record makes clear that Orwat's own attorney was responsible for at least one of the continuances in the hearing, (# 53 at 4, ¶ 11), and that the hearing officer continued the hearing to allow Orwat and his counsel an opportunity to view a continuous copy of the videotape. (# 55 at 5, ¶ 16). While it is true that DOC regulations require that inmates receive notice of disciplinary charges within a certain framework, the regulations also permit a waiver of those requirements at the discretion of the Superintendent.[11] Defendant Therien applied for and was granted a waiver. (# 54, Exh. J at 54.) Thus, any delay in the hearing was permissible under state regulations, and reasonable on the facts.

The Court concludes that Orwat has not established that his placement in "awaiting action" status constituted "an atypical, significant deprivation giving rise to a federally protected liberty interest." Inasmuch as the Court also concludes below that the hearing itself complied with constitutional due process requirements, the Court recommends that summary judgment enter in favor of the Defendants on Count 6 [12].

**b. Did the Hearing Meet Constitutional Requirements?**

The Supreme Court has set forth the minimum procedural safeguards required to satisfy due process in a prison proceeding in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) as follows: 1) advance written notice of the charges at least 24 hours before the hearing; 2) the opportunity to appear at the hearing, to call witnesses and to present rebuttal evidence; and 3) a written statement by the factfinders as to the evidence relied on for their decision and the reasons for the prison committee's action. *Id.* at 564–66, 94 S.Ct. at 2978–80. Orwat admits that he received written notice of the hearing on April 23, 2001, (# 1 ¶ 51,) well in advance of the hearing. Furthermore, Orwat does not dispute that he was present at the hearing, and had the opportunity to present witnesses and evidence. Rather, Orwat alleges that the hearing officer was biased; that the hearing officer did not require witnesses to be sworn in; and that the hearing officer's findings are unsupported by the evidence.

The Court begins with *Wolff*'s predicate: "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2975 (citation omitted). *Wolff* held that cross-examination and confrontation of witnesses is not required under the Constitution's Due

---

11. 103 CMR § 430.23 states that: "All procedural time limits set forth in 103 CMR 430.00 are directory and may be waived by the Superintendent . . . ."

12. Under *Sandin*, of course, where no federally cognizable liberty interest is at stake, the minimal due process requirements set forth in *Wolff* are not required. Though the Court's conclusion that Orwat has failed to establish that he was deprived of a federally protected liberty interest is sufficient to determine Or-

wat's due process claim under Count 6, the Court addresses Orwat's allegations that the hearing itself violated the due process clause to the extent that those claims bear on the conspiracy analysis above, in Count 5. The Court's determination that the hearing met constitutional due process standards provides an alternative basis for recommending summary judgment in favor of the defendants on Count 6.

Process Clause, *id.* at 567–68, 94 S.Ct. at 2979, and so it follows that a hearing officer properly exercises her considerable discretion in curtailing cross-examination. *See Smith,* 936 F.2d at 1400 (hearing officers are not constitutionally required to explain "every curtailment of an inmate's questioning of a witness during a disciplinary hearing.") Further, prison regulations state that hearing officers are not "bound by the rules of evidence observed by the courts of the Commonwealth," 103 CMR 430.13, and so the hearing officer was within her discretion in relying on unsworn testimony. *Cf. Samuels v. Selsky,* 2003 WL 22439793, *15 (S.D.N.Y., 2003) (noting that Supreme Court precedent provides "leeway to prison officials to engage in disciplinary actions on the basis of some forms of evidence that trial courts would find inadmissible, improper or insufficient.")

Orwat also alleges that the hearing officer was biased.[13] Certainly, "the touchstone of due process is protection of the individual against arbitrary action of government." *Wolff,* 418 U.S. at 558, 94 S.Ct. at 2976 (citations omitted.) Even so, *Wolff* establishes that its minimum requirements provide the due process protection against arbitrary action within the prison setting. *Id.* at 565, 94 S.Ct. at 2979 (stating that "the provision of a written record helps to ensure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts ... will act fairly."). *See also Superintendent,*

*Massachusetts Correctional Institution, Walpole v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985) (stating that "[r]equiring a modicum of evidence to support a decision ... will help to prevent arbitrary deprivations ....") Thus, this Court's review is limited to whether *Wolff*'s minimum protections were met, and whether the written record provided by the fact finder presents "some evidence" to support the findings made in the disciplinary hearing. *Superintendent, Massachusetts Correctional Institution, Walpole,* 472 U.S. at 455, 105 S.Ct. at 2774. On this record, the Court has no difficulty finding some evidence to support the hearing officer's guilty finding and imposition of the eight-month sanction. The hearing officer credited the testimony of Padula and Shugrue. She rejected the affidavits of inmate Veins and Gordon Reid, because they were not eye-witnesses to the events, and she noted inconsistencies in Veins' testimony. The hearing officer determined that the videotape revealed no activities within the cell, and stated that she did not rely on it in making her determinations. (# 54, Exh. J, Administrative Record). This evidence certainly exceeds the "meager" evidence presented in *Superintendent, Massachusetts Correctional Institution, Walpole,* 472 U.S. at 457, 105 S.Ct. at 2775 (determining that testimony of prison guard and his written report were sufficient to meet the requirements of the Due Process Clause).[14]

---

**13.** Orwat's brief makes no effort to substantiate the allegations of bias in his complaint. Orwat has alleged simply that the hearing officer addressed the correctional officers by their first names, and that she apologized for taking up their time. The Court notes that she also addressed the Plaintiff by his first name. Although the "due process requirements for a prison disciplinary hearing ... are not so lax as to let stand the decision of a biased hearing officer who dishonestly sup-

presses evidence of innocence ...," *Edwards v. Balisok,* 520 U.S. 641, 647, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), Orwat has not made such allegations, nor has he substantiated the allegations he has made.

**14.** Orwat also alleged that he is entitled to judicial review of the disciplinary proceeding under Mass. Gen. L. ch. 249, § 4. That statute provides for certiorari review of disciplinary proceedings and contains a sixty-day statute of limitations. Orwat has failed to comply

## C. State Law Claims

### 1. Count 7: Violation of Massachusetts Civil Rights Act, G.L. c. 12 §§ 11H, 11I

Orwat also alleges that all defendants, with the exception of Therien, have violated the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H and 11I (the "MCRA"). To establish a claim under the MCRA, "plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395, 668 N.E.2d 333, 337 (1996) (citations omitted.) "A direct violation of civil rights is not, without a showing of coercive behavior, actionable." *Britton v. Maloney*, 901 F.Supp. 444, 453 (D.Mass., 1995) (citing *Longval v. Comm'r of Correction*, 404 Mass. 325, 333, 535 N.E.2d 588, 593 (1989)(other citation omitted)).

Orwat alleges that the Defendants violated the MCRA when they "acted in a vindictive manner and for an improper purpose in entering the Plaintiff's cell with the intention to confront and assault him; by assaulting and battering the Plaintiff without provocation; by failing to protect the Plaintiff; by subjecting the Plaintiff to an excessive period of incarceration without due process; and by conspiring and acting to alter evidence and to present false testimony concerning the Plaintiff." Complaint, # 1 ¶ 59.

As previously discussed, Orwat has succeeded in establishing for summary judgment purposes only an Eighth Amendment violation against Padula. His claims against the remaining Defendants under the MCRA fail because Orwat has not established that those Defendants deprived him of any rights. *See, e.g., Columbus v. Biggio*, 76 F.Supp.2d 43, 54 (D.Mass.1999); *Jiles v. Dep't of Correction*, 55 Mass.App.Ct. 658, 664, 774 N.E.2d 150, 156 (2002) (MCRA claim fails where inmate fails to establish constitutional violation). *Cf. Shabazz v. Cole*, 69 F.Supp.2d 177, 202 (D.Mass., 1999) (inmate's MCRA claim actionable where inmate had sufficiently alleged a First Amendment violation when he claimed that defendant filed false disciplinary report in retaliation for inmate's filing grievance); *Murphy v. Cruz*, 52 Mass.App.Ct. 314, 753 N.E.2d 150 (2001) (inmate held to have sufficiently alleged a claim for exercise of First Amendment rights as basis for MCRA claim).

Orwat has produced sufficient evidence to establish that Padula interfered with his Eighth Amendment rights, satisfying the first and second prongs of the analysis. However, Orwat has not established that Padula deprived him of his rights by "threats, intimidation or coercion." Though he has alleged that he and Padula "exchanged words," he has not established that those words accomplished a deprivation by threats. Rather, Padula's purported use of excessive force is a "direct violation of [Orwat's Eighth Amendment rights, which] does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act." *Longval v. Commissioner of Correction*, 404 Mass. 325, 333, 535 N.E.2d 588, 593 (1989) (citation omitted.) It is Padula's alleged conduct that caused the deprivation, and ("[c]onduct, even unlawful conduct ... lacks [the] qualities [of threats, intimidation or coercion]

---

with the statute of limitations. His appeal was denied on September 28, 2001, and he filed suit on March 13, 2002. *See generally Balsavich*, 2004 WL 1497687, *4 n. 8.

when all it does is take someone's rights away directly.") *Id.* at 333–34, 535 N.E.2d at 593 (citation omitted). Orwat has established "[a]t most, ... deprivations and threats, not deprivations by threats." *Columbus,* 76 F.Supp.2d at 54 (noting that MCRA requires "nexus between threats and deprivations of rights ....")

For all the above reasons, the Court recommends that summary judgment enter in favor of all the Defendants on Count 7, alleging violations of the MCRA.

## 2. Intentional Infliction of Emotional Distress

In Count 9, Orwat brings claims for intentional infliction of emotional distress against Padula, Shugrue and Grossi. In order to establish a claim for intentional infliction of emotional distress, Orwat must prove that: "(1) Defendants 'intended to inflict emotional distress or ... should have known that emotional distress was the likely result of [their] conduct'; (2) Defendants' 'conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community'; (3) Defendants 'actions ... were the cause of [his] distress'; and (4) the distress 'was severe and of a nature that no reasonable [person] could be expected to endure it.' " *Columbus,* 76 F.Supp.2d at 56 (quoting *Agis v. Howard Johnson Co.,* 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976)). Orwat argues that Padula's assault and filing of false disciplinary charges and false testimony was "extreme and outrageous." Likewise, he argues that Shugrue's falsely testifying to support the false charges, and Grossi's alteration of the videotape to cover up the alleged assault amount to "extreme and outrageous" conduct. As previously discussed, the record establishes that Orwat and his attorney were able to view the complete videotape and Orwat was otherwise unharmed by the alleged alteration,

*i.e.,* the altered videotape in no way contributed to his confinement. The Court concludes that no reasonable inference can be drawn that Grossi's alleged tampering of the tape, standing alone, contributed to Orwat's emotional distress.

On the other hand, Orwat has alleged that Padula assaulted and battered him without justification and filed false charges accusing Orwat of assaulting him. He has further alleged that Padula and Shugrue both testified falsely to support those charges. A jury could find that falsely testifying against an inmate, knowing that the testimony would result in confinement, amounts to "extreme and outrageous" conduct. Orwat offers his own testimony and the testimony of two other inmates who heard the altercation to create an issue of fact on the question of whether Padula hit Orwat repeatedly without cause. The Court concludes that a question of fact exists on whose version of events is credible and on the question of whether Padula and Shugrue did indeed testify falsely. Orwat has further pointed to evidence of "severe" emotional distress, stating that his anxiety disorder has "significantly worsened" and that he feels "nervous and paranoid" around correctional officers. (# 55, Exh. J at 5). He states that he has received treatment for emotional distress at the correctional facility, though he offers no proof to that effect.

"Massachusetts courts are fairly liberal about allowing emotional distress claims to go to the jury [and such] claims should go to the jury 'if reasonable people could differ on whether the conduct is 'extreme and outrageous.' " *Columbus,* 76 F.Supp.2d at 56–57 (quoting *Boyle v. Wenk,* 378 Mass. 592, 595–597, 392 N.E.2d 1053 (1979)). The Court concludes that reasonable people could differ on whether Padula's and Shugrue's alleged conduct was "extreme and outrageous."

For these reasons, the Court recommends that summary judgment be granted in favor of Grossi on Count 9, and denied against Padula and Shugrue.

## IV. RECOMMENDATIONS

For all the reasons stated, the Court RECOMMENDS that summary judgment be GRANTED in favor of defendant Shugrue on Count 2 (Eighth Amendment), in favor of all the Defendants on Counts 5 (Conspiracy to Violate Civil Rights) and 6 (Procedural Due Process Violation,) in favor of all the Defendants on Count 7 (Violation of MCRA), and in favor of defendant Grossi on Count 9 (Intentional Infliction of Emotional Distress).

The Court FURTHER RECOMMENDS that Count 3 against defendants Maloney and Pepe be DISMISSED and that Counts 5, 6, 7 and 9 against defendant Therien be DISMISSED as unopposed by the Plaintiff.

The Court RECOMMENDS that the motion be otherwise DENIED.

## V. REVIEW BY THE DISTRICT JUDGE

The parties are hereby advised that pursuant to Rule 72, Fed.R.Civ.P., any party who objects to these recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed.R.Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valen-cia–Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378–379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

February 10, 2005.